**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| NORMAN IP HOLDINGS, LLC, | No. 6:13-cv-384 LED-JDL |
| *Plaintiff*, | |
| v. | LEAD CASE |
| TP-LINK TECHNOLOGIES, CO., | |
| *Defendant*. | |

| | |
|---|---|
| NORMAN IP HOLDINGS, LLC, | No. 6:13-cv-394 LED-JDL |
| *Plaintiff*, | |
| v. | CONSOLIDATED CASE |
| CRESTRON ELECTRONICS, INC., | |
| *Defendant*. | |

## ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO FIRST AMENDED COMPLAINT

Defendant Crestron Electronics, Inc. ("Crestron") answers Plaintiff Norman IP Holdings, LLC's ("Norman IP") First Amended Complaint ("Complaint") as follows, taking into account the Court's Order dated March 31, 2014 ("the March 31, 2014 Order"), which dismissed Norman IP's claims of contributory, induced, and willful infringement of U.S. Patent No. 5,592,555 ("the '555 patent"). Crestron denies Norman IP's allegations and averments except as specifically admitted in this Answer.

## I.     NATURE OF THE ACTION

1.      Crestron admits that the Complaint purports to assert claims of patent infringement, but Crestron denies the merits of all such allegations.  Crestron specifically denies it has committed any acts of infringement.

2.      Crestron admits that a purported copy of the '555 patent is attached as an exhibit to the Complaint.  Crestron lacks sufficient information or knowledge to admit or deny the remaining allegations in paragraph 2, and on that basis, denies the allegations.

3.      Crestron denies the allegations in paragraph 3.  Crestron further notes that the March 31, 2014 Order has dismissed Norman IP's claims of contributory, induced, and willful infringement of the '555 patent.

4.      Paragraph 4 contains conclusions of law to which no response is required.  To the extent paragraph 4 contains any factual allegations, they are denied.  Crestron denies that Norman IP is entitled to injunctive relief, monetary damages, or prejudgment interest.

## II.     THE PARTIES

5.      Crestron denies that Norman IP is a corporation.  Crestron further denies that Norman IP's principal place of business is located at 100 E. Ferguson, Suite 900, Tyler, Texas 75702.  Based on information and belief, Norman is a limited liability company having its principal place of business (i.e., "nerve center") in the State of New York.

6.      Admitted.

## III.     JURISDICTION AND VENUE

7.      Paragraph 7 contains conclusions of law to which no response is required.  To the extent paragraph 7 contains any factual allegations, they are denied.

8.      Paragraph 8 contains conclusions of law to which no response is required.  To the extent paragraph 8 contains any factual allegations, they are denied.

## IV.     PLAINTIFF'S '555 PATENT

9.      Crestron denies any allegations contained in paragraph 9 that vary from or are inconsistent with the language of the '555 patent.  Crestron lacks sufficient information or knowledge to admit or deny the remaining allegations in paragraph 9, and on that basis, denies the allegations.

10.      Crestron lacks sufficient information or knowledge to admit or deny the allegations in paragraph 10, and on that basis, denies the allegations.

## V.     (*missing header*)

*To the extent that any allegations may have been intended under this header, Crestron denies these allegations.*

## VI.     DEFENDANTS' ACTS

11.      Crestron denies the allegations in paragraph 11.  Crestron further notes that the March 31, 2014 Order has dismissed Norman IP's claims of contributory, induced, and willful infringement of the '555 patent.

12.      These allegations are not worded in a manner that can be admitted or denied.  To the extent that the allegations in paragraph 12 can be denied, Crestron denies these allegations.

13.      Crestron denies the allegations in paragraph 13.  Crestron further notes that the March 31, 2014 Order has dismissed Norman IP's claims of contributory, induced, and willful infringement of the '555 patent.

14.      Crestron denies the allegations in paragraph 14.  Crestron further notes that the March 31, 2014 Order has dismissed Norman IP's claims of contributory, induced, and willful infringement of the '555 patent.

15.      Crestron admits that on April 1, 2013, it received a letter dated March 25, 2013, from Norman IP.  Crestron denies all remaining allegations of paragraph 15.

16.     Crestron denies the allegations in paragraph 16.  Crestron further notes that the March 31, 2014 Order has dismissed Norman IP's claims of contributory, induced, and willful infringement of the '555 patent.

17.     Denied.

18.     Crestron denies the allegations in paragraph 18.  Crestron further notes that the March 31, 2014 Order has dismissed Norman IP's claims of contributory, induced, and willful infringement of the '555 patent.

19.     Denied.

**COUNT ONE**

**PATENT INFRINGEMENT—U.S. PATENT NO. 5.592,555**

20.     Crestron incorporates herein its responses to paragraphs 1-19.

21.     Denied.

22.     Crestron denies the allegations in paragraph 22.  Crestron further notes that the March 31, 2014 Order has dismissed Norman IP's claims of contributory, induced, and willful infringement of the '555 patent.

23.     Denied.

24.     Denied.

**VII.   JURY DEMAND**

25.     Paragraph 25 does not contain any factual allegations to which a response is required by Crestron.

**VIII.   REQUEST FOR RELIEF**

In response to Norman IP's request for relief, Crestron denies that Norman IP is entitled to any relief whatsoever from Crestron, either as requested in its First Amended Complaint or otherwise.  For example, Norman IP is not entitled to the injunctive relief requested in the First

Amended Complaint at least because the '555 patent expired on April 12, 2014.  In further answer to Norman IP's First Amended Complaint, Crestron denies each and every allegation contained in Norman IP's First Amended Complaint that is not specifically admitted, denied, or otherwise responded to in this Answer, Affirmative Defenses, and Counterclaims.

## AFFIRMATIVE DEFENSES

In further Answer to Norman IP's First Amended Complaint, Crestron alleges and asserts the following defenses, affirmative or otherwise, undertaking the burden of proof on such defenses only to the extent required by law.  Crestron reserves the right to amend or add additional defenses that become known through the course of discovery.

### First Affirmative Defense - Failure to State a Claim Upon Which Relief Can Be Granted

26.     Norman IP's First Amended Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense - Non-Infringement

27.     Crestron does not infringe and has not infringed the '555 patent, either directly, contributorily, by inducement, jointly, literally, or under the doctrine of equivalents.

### Third Affirmative Defense - Invalidity

28.     The claims of the '555 patent are invalid for failure to comply with one or more of the conditions for patentability set forth in Title 35 of the United States Code, including 35 U.S.C. §§ 101, 102, and/or 103.

29.     The claims of the '555 patent are invalid for failure to comply with one or more of the requirements of 35 U.S.C. §§ 112.

### Fourth Affirmative Defense – Lack of Standing

30.     Upon information and belief, one or more of the contracts under which Norman

IP and/or its predecessors obtained ownership of the '555 patent may be void and/or unenforceable under the laws of the United States, the laws of State of Texas, or the laws of a state whose laws have been chosen by the parties to govern that contract.

31.     Upon information and belief, one or more other parties have been granted certain substantial rights in the '555 patent under at least one agreement entered into by Norman IP and/or its predecessors.

32.     Norman IP lacks standing to assert the '555 patent because does not hold all substantial rights to the '555 patent.

**Fifth Affirmative Defense - Prosecution History Estoppel**

33.     Norman IP is estopped from construing the claims of the '555 patent in such a way as may cover Crestron's products by reason of statements made to the U.S. Patent and Trademark Office ("USPTO") during the prosecution of the application that led to the issuance of the '555 patent and during subsequent reexaminations.

**Sixth Affirmative Defense – Limitation of Damages**

34.     Norman IP's claim for damages is limited under 35 U.S.C. §§ 286 and 287.

**Seventh Affirmative Defense - Inequitable Conduct During Original Prosecution**

35.     The '555 patent is unenforceable due to inequitable conduct during its original prosecution because the named inventor of the '555 patent, Brett B. Stewart, deliberately withheld information published by his employer and the original assignee of the '555 patent, Advanced Micro Devices, Inc. (hereinafter "AMD"), describing products offered for sale by AMD, despite Stewart's knowledge that this information was material to the '555 patent.

**Materiality**

36.     AMD published a design specification for the Am79C410 CT2 PhoX™

Controller for Digital Cordless Telephones as Publication 17673 Revision A in February 1993, which is more than one year prior to the filing date of the '555 patent.

37.    The '555 patent includes repeated references to the design specification for the Am79C410.

38.    For example, the '555 patent at column 4, lines 52-56, states that the "operation of circuitry that satisfy the structural and functional requirements of CT2 controller 16 in the present embodiment appears in the design specification for the 79C410 CT2 PhoX™ control circuit".

39.    As a further example, the '555 patent at column 3, lines 48-52, states that an "embodiment of the present invention uses a communications controller circuit such as the Am79C410 that Advanced Micro Devices of Sunnyvale, Calif. produces and that has the trademark name 'CT2 PhoX™' control controller for digital telephones".

40.    The design specification for the Am79C410 was not submitted to the USPTO during prosecution of the '555 patent.

41.    Claim 43 of the '555 patent includes the following preamble: "[a] communications controller circuit for privately communicating communication signals over a wireless communications network".

42.    The design specification for the Am79C410 discloses a communications controller circuit for privately communicating communication signals over a wireless communications network.

43.    Claim 43 of the '555 patent includes the following element: "a transceiver associated with said communications controller circuit or transmitting said enciphered and processed communication signals from said communications controller circuit".

44.     The design specification for the Am79C410 discloses a transceiver ("CT2 RF Transceiver", at page 1) associated with said communications controller circuit or transmitting said enciphered and processed communication signals from said communications controller circuit ("data may be routed off-chip to an external encryption circuit for security reasons", at page 25).

45.     Claim 43 of the '555 patent includes the following element: "a signal processing circuit within said communications controller circuit for processing communications signals to form processed communication signals and further for enciphering said processed communication signals".

46.     The design specification for the Am79C410 discloses a signal processing circuit ("[t]he heart of the device is the 80C32T2, an 8051-class microcontroller", at page 2) within said communications controller circuit for processing communications signals to form processed communication signals ("[the 80C32T2 microcontroller] can perform CT2 Layer 3 and partial Layer 2 functions", at page 2).

47.     Page 12 of design specification for the Am79C410 expressly states that the "[t]he microcontroller in the Am79C410 is a member of the 8051 Family of microcontrollers, with the standard 8051 Family architecture and instruction set."

48.     The 80C32T2 microcontroller was an AMD product described in literature published by AMD more than one year prior to the filing date of the '555 patent, such as the "Eight-Bit 80C51 Embedded Processors 1990 Data Book" (hereinafter "1990 Data Book").

49.     According to its Preface, the 1990 Data Book "provides complete information on the wide variety of 8-bit 8051 Family microcontrollers from Advanced Micro Devices" and "serves as a core that is useful to designing with all of AMD's microcontrollers," including the

80C32T2.

50.     The 1990 Data Book at page 6-15 states that "most banking terminals and other systems using the DES have needed special boards or peripheral controller chips just for the encryption decryption process, and still more hardware to form a serial bit stream for transmission (Figure 6-10a).  An 8051 solution could pack most of the entire system onto the one chip (Figure 6-10b).  The whole DES algorithm would require less than one-fourth of the on-chip program memory, with the remaining bytes free for operating the banking terminal (or whatever) itself.  Moreover, . . . the unencrypted data (plaintext) never even exists outside the microcomputer!  Naturally, this would afford a high degree of security from data interception."

51.     Thus, the 1990 Data Book, at page 6-15, expressly suggests modifying the disclosure of the design specification of the Am79C410 such that "the 80CT32T2, an 8051-class microcontroller" both "can perform CT2 Layer 3 and partial Layer 2 functions" (as described on page 2 of the design specification of the Am79C410) and also can perform "the encryption decryption process" and more particularly the "whole DES algorithm".

52.     The 1990 Data Book provides motivation for this modification by disclosing that it would have been feasible ("The whole DES algorithm would require less than one-fourth of the on-chip program memory, with the remaining bytes free for operating the . . . terminal . . . itself") and advantageous ("[T]he unencrypted data (plaintext) never even exists outside the microcomputer!  Naturally, this would afford a high degree of security from data interception.")

53.     The arrangement suggested by the combination of the design specification of the Am79C410 and the 1990 Data Book in which "the 80CT32T2, an 8051-class microcontroller" both "can perform CT2 Layer 3 and partial Layer 2 functions" and also can perform "the encryption decryption process" (e.g., the "whole DES algorithm") meets the limitation of claim

43 of the '555 patent directed to "signal processing circuitry for processing communications signals and for enciphering the processed communications" under the broad construction whose reasonableness was argued by Saxon, accepted by the Court, and adopted by Norman IP.  *See, e.g.*, *Claim Construction Opinion* issued as Document 311 on July 31, 2009 in *Saxon Innovations, LLC v. Nokia Corp.*, Case No. 6:07-cv-00490 (E.D. Tex.) at pages 14-16.

54.     Norman IP has taken the position, with regards to the '555 patent, that, "[t]he present invention makes possible digital signature authentication and message encryption using either a single DSP or a single microprocessor, or using both a DSP and a microprocessor".  *See, e.g.*, *Plaintiff Norman IP Holdings, LLC's Opening Claim Construction Brief* filed as Document 194 on November 29, 2010 in *Norman IP Holdings, LLC v. Casio Computer Co., Ltd*., Case No. 6:09-cv-00270 (E.D. Tex.) at page 6.

55.     Norman IP has taken the position, with regards to the '555 patent, that, "the '555 specification and file history do not limit 'signal processing circuit' to a signal processor, but instead support a construction that encompasses any 'circuit that executes program instructions to process communication signals and executes program instructions to encipher and decipher such signals'".)  *See, e.g.*, *Plaintiff Norman IP Holdings, LLC's Opposition to Kyocera's Motion for Summary Judgment of Invalidity of Certain Claims of U.S. Patent No. 5,592,555* filed as Document 200 on December 23, 2010 in *Norman IP Holdings, LLC v. Casio Computer Co., Ltd*., Case No. 6:09-cv-00270 (E.D. Tex.) at page 10.

56.     During the original prosecution of the '555 patent, independent claim 43 was allowed responsive to an argument that "Applicant's invention is patentably distinct . . . in that Applicant's claimed invention implements encryption/decryption as an additional task performed by the signal processing circuit."  *See, e.g.*, the Amendment filed on July 22, 1996 as Paper No.

10 in U.S. Patent Application No. 08/226,717 at page 30.

57.     The combination of the design specification of the Am79C410 and the 1990 Data Book clearly suggest a communications controller circuit which "implements encryption/decryption as an additional task performed by the signal processing circuit."

58.     The combination of the design specification of the Am79C410 and the 1990 Data Book suggests every element of the communications controller circuit recited in claim 43, including "a signal processing circuit within said communications controller circuit for processing communications signals to form processed communication signals and further for enciphering said processed communication signals."

59.     Thus, the design specification of the Am79C410 and the 1990 Data Book are but-for material to the '555 patent because at least claim 43 would not have been issued by the USPTO had these references been submitted during the original prosecution of the '555 patent.

60.     With citations omitted, *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1288 (Fed. Cir. 2011) (*en banc*) states that "inequitable conduct regarding any single claim renders the entire patent unenforceable.  Unlike other deficiencies, inequitable conduct cannot be cured by reissue or reexamination."

61.     The inequitable conduct during the original prosecution of the '555 patent with respect to claim 43 is neither cured nor mooted by the subsequent cancellation of that claim during *Ex Parte* Reexamination Control No. 90/010,757.

62.     To the extent it is relevant, the USPTO's rejection and Norman IP's cancellation of claim 43 during reexamination of the '555 patent provides further evidence that the USPTO would not have issued claim 43 had the withheld references been properly disclosed during the original prosecution of the '555 patent.

**Intent**

63.     The repeated references within the '555 patent to the design specification for the Am79C410 demonstrate that inventor of the '555 patent, Brett B. Stewart, knew both of the existence of the design specification for the Am79C410 and also of its materiality to the '555 patent.

64.     The design specification for the Am79C410 repeatedly emphasizes the importance of its 8051-class microcontroller.

65.     For example, page 2 of the design specification for the Am79C410 expressly states that "[t]he heart of the device is the 80C32T2, an 8051-class microcontroller".

66.     As a further example, page 1 of the design specification for the Am79C410 expressly states that the "[o]n-Chip 8051-class microcontroller controls all functions".

67.     As a further example, page 2 of the design specification for the Am79C410 expressly states that the "[t]he Am79C410 formatter performs all the CT2 protocol requirements as well as baseband transmission and reception under control of the on-chip 8051-class microcontroller".

68.     As a further example, page 12 of design specification for the Am79C410 expressly states that the "[t]he microcontroller in the Am79C410 is a member of the 8051 Family of microcontrollers, with the standard 8051 Family architecture and instruction set".

69.     In view of the importance of the Am79C410 controller to the '555 patent, and the importance of the 80C32T2 to the Am79C410 controller, Stewart would have known about both the existence and the materiality of the 1990 Data Book, which "provides complete information on the wide variety of 8-bit 8051 Family microcontrollers from Advanced Micro Devices," including the 80C32T2.

70.     Stewart also would have known about both the existence and the materiality of the 1990 Data Book, which "serves as a core that is useful to designing with all of AMD's microcontrollers," by virtue of Stewart's personal interest in microprocessor programming.

71.     Upon information and belief, Stewart served as Chair for "Case Studies in High-End Embedded Systems" at the Thirty-Fifth IEEE Computer Society International Conference held from February 26 to March 2, 1990 (also known as "COMPCON Spring '90").

72.     Stewart also co-authored an article entitled "Register Usage Strategies" which was published on pages 66-72 of the November 1991 issue of the *C Users Journal*.  According to page 67 thereof, "this article discusses register usage strategies for four popular processors." This article also states on page 66 that Stewart has "supplied C compilers for multiple different microprocessors to the world engineering community."

73.     Other individuals associated with patent prosecution at AMD were aware of the materiality of the 1990 Data Book with regard to products from the same family as the Am79C410.

74.     For example, both a Technical Manual for the "Am79C432 ISM PhoX™ Controller for Cordless Digital Telephones" and the 1990 Data Book were cited by AMD during the prosecution of U.S. Patent No. 6,154,820.

75.     The website of Stewart's current employer (Acumera) describes him as having been "responsible for business development and IP licensing in the network, WiFi and DSL semiconductor markets" at AMD.

76.     According to *In re Wayport, Inc., Litigation*, 76 A.3d 296, 303 (Del. Ch. 2013), Stewart has stated that he has "credentials" with respect to "patent asset management strategies" because he is "a named inventor on . . . system and method patents, and [because he] pretty much

only did technology IP strategy and deals globally for AMD."

77.     Given Stewart's knowledge and interest concerning patents, Stewart would have known about his duty to disclose to material references to the USPTO during patent prosecution.

78.     Stewart withheld the design specification for the Am79C410 and the 1990 Data Book with the intent to deceive the USPTO.

79.     Similar accusations of inequitable conduct involving failure by AMD inventors to disclose AMD literature describing AMD products have been repeatedly raised in prior litigation with respect to U.S. Patent No. 5,502,689 ("the '689 patent").

80.     The similarities between AMD's inequitable conduct during prosecution of the '555 patent and the '689 patent suggest that AMD and its inventors have engaged in a pattern of deceit before the USPTO.

**Eighth Affirmative Defense
(Inequitable Conduct During Reexamination)**

81.     The '555 patent is unenforceable because of inequitable conduct during reexamination.

82.     On March 26, 2013, Norman IP's reexamination counsel, Joseph T. Helmsen, filed a Notice of Appeal in *Ex parte* Reexamination No. 90/012,783 of the '555 patent, in which Helmsen affirmatively represented that Norman IP is entitled to small entity status, and paid a reduced fee associated with small entity status.

83.     Norman IP is not entitled to claim small entity status for the '555 patent because it has been licensed to large entities.  In fact, the Amended Complaint asserts that "Norman IP and its predecessors in interest have licensed the '555 Patent to dozens of Fortune 500 companies, directly and indirectly," and Norman IP has made similar assertions in prior litigation.

84.     Helmsen is a partner at a major law firm, Pepper Hamilton LLP, who has been

admitted to practice patent law before the USPTO since 2003.

85.     Helmsen is presumably familiar with the USPTO rules concerning eligibility for small entity status, such as 37 CFR 1.27(h) ("Prior to submitting an assertion of entitlement to small entity status . . . . [i]t should be determined that all parties holding rights in the invention qualify for small entity status.") and MPEP 509.02(V) ("The payment of reduced fees under 35 U.S.C. 41 is limited to those situations in which all of the rights in the invention are owned by small entities. . . . A grant of a non-exclusive license to a non-small entity will disqualify applicant from claiming small entity status.").

86.     Helmsen undoubtedly knew about Norman IP's prior litigation and the resulting settlements.  On June 5, 2013, Helmsen filed Paper No. 9 in an *inter partes* review of the '555 patent, IPR2013-00278, which included a list of litigation in which Norman IP had asserted the '555 patent and updated dates on which they had been settled.

87.     Indeed, much of the litigation and licensing of the '555 patent was conducted by Helmsen's firm, Pepper Hamilton LLP.

88.     For example, the license under which Research in Motion acquired rights to the '555 patent (available in redacted form as Exhibit A to Order 46C in International Trade Commission Investigation 337-TA-673) specifies that notices regarding the license should be sent to Pepper Hamilton LLP.

89.     37 CFR 1.27(h)(2) states that "[i]mproperly, and with intent to deceive, establishing status as a small entity, or paying fees as a small entity, shall be considered as a fraud practiced or attempted on the Office."

90.     Helmsen knew that licenses to the '555 patent had been granted to a large entity, and the single most reasonable inference is that he deliberately withheld that information in order

to pay small entity fees.

91.     Helmsen's deceptive intent is further evidenced by a pattern of misconduct during *Ex parte* Reexamination No. 90/012,783.  37 CFR 1.565(a) states that "[i]n an *ex parte* reexamination proceeding before the Office, the patent owner must inform the Office of any prior or concurrent proceedings in which the patent is or was involved such as interferences, reissues, *ex parte* reexaminations, *inter partes* reexaminations, or litigation and the results of such proceedings."

92.     In every communication issued by the USPTO during *ex parte* reexamination No. 90/012,783, Helmsen was "reminded of the continuing responsibility under 37 CPR 1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving the ['555] patent throughout the course of this reexamination proceeding." *See, e.g.*, Decision Granting Ex Parte Reexamination mailed on April 16, 2013 at page 17, last paragraph; Non-Final Office Action mailed on September 11, 2013 at page 11, first paragraph; and Final Office Action mailed on January 23, 2014 at page 15, last paragraph.

93.     Helmsen filed Paper No. 9 on June 5, 2013 in an *inter partes* review of the '555 patent, IPR2013-00278, which included a list of litigation in which Norman IP had asserted the '555 patents.

94.     Helmsen failed to disclose many of the lawsuits listed on that paper, including the present lawsuit, to the USPTO in pending *ex parte* reexamination 90/012,783, despite Helmsen's continuing duty to disclose concurrent litigation involving the '555 patent.

95.     Helmsen also failed to disclose *inter partes* review IPR2013-00278 to the USPTO in *ex parte* reexamination 90/012,783, despite Helmsen's continuing duty to disclose concurrent proceedings involving the '555 patent.

**Ninth Affirmative Defense – License, Patent Exhaustion, and Patent Misuse**

96.     Norman IP's claims are barred, in whole or in part, in view of licensed rights in the '555 patent, implied or otherwise.  Norman IP's claims are also barred under the doctrine of patent exhaustion.  In particular, several accused chipmakers in this litigation may have licenses in the asserted '555 patent by way of settlement, assignment, or membership in RPX.

97.     For example, Norman IP is asserting in this litigation that Marvell 802.11-compliant wireless chipsets (a non-limiting example is the Marvell 88W8686) contained in products sold by Crestron in the United States infringe its '555 patent.

98.     Upon information and belief, in January of 2010, Norman IP and RPX Corporation, a California patent aggregator, executed a Patent License and Assignment Agreement.

99.     Upon information and belief, under the terms of the Norman-RPX license agreement, Norman IP conveyed, among other rights, a license to manufacture, use, and sell products within the scope of the '555 Patent to RPX.

100.     Upon information and belief, the Norman-RPX license agreement also gives RPX an express right to grant sublicenses to its members which include rights to manufacture, use, and sell products within the scope of the '555 Patent.

101.     Upon information and belief, the Norman-RPX license agreement requires RPX to provide written notice to Norman IP whenever RPX grants a sublicense under the '555 patent.

102.     Upon information and belief, RPX has repeatedly stated that any company which becomes a member of RPX acquires a license to every patent in which RPX has rights, including the '555 patent.

103.     On October 4, 2010, RPX issued a public statement announcing that several

companies, including Marvell, had recently become members of RPX.

104.    Upon information and belief, Marvell became a member of RPX at least as early as October 4, 2010.

105.    Upon information and belief, when Marvell became a member of RPX, Marvell was granted a sublicense to the '555 patent pursuant to the Norman-RPX license agreement.

106.    Upon information and belief, when Marvell became a member of RPX, Norman received written notice that Marvell had been granted a sublicense to the '555 patent pursuant to the Norman-RPX license agreement.

107.    Norman IP has used language and/or exhibited conduct from which members of RPX may properly infer that Norman IP consented and/or acquiesced to use of the '555 patent by RPX members.

108.    Upon information and belief, Norman IP's litigation counsel, Andrew DiNovo of DiNovo Price Ellwanger & Hardy LLP, has conceded that the Norman-RPX license agreement prevents Norman IP from asserting the '555 patent against purchasers or users of products manufactured or sold by RPX members.

109.    For example, Document 527-2 filed in *Norman IP Holdings, LLC v. Lexmark Int'l, Inc.*, No. 6:11-cv-00495 (E.D.Tex.) shows that Norman IP's litigation counsel, Andrew DiNovo of DiNovo Price Ellwanger & Hardy LLP, stated on March 29, 2013 that "Norman has been advised that STMicroelectronics N.V. ('STM') has taken a sublicense to Norman's patents via RPX.  Accordingly, Norman withdraws all of its claims based upon STM products."

110.    Upon information and belief, the manufacture, use, and sale of the Marvell chipsets accused of infringement in Norman IP's First Amended Complaint is licensed in the United States under the terms and conditions of the Norman-RPX license agreement.

111.    Norman IP's claims against Crestron are also barred because Norman IP's rights under the '555 patent against subsequent purchasers and users of the accused Marvell chipsets are exhausted by the rights to manufacture, use, and sell conveyed to RPX and its members by the terms of the Norman-RPX agreement.

112.    Upon information and belief, at the time of filing the Amended Complaint, Norman IP had actual knowledge that the Marvell chipsets accused of infringement in Norman IP's First Amended Complaint were licensed under the terms and conditions of the Norman-RPX license agreement such that Norman IP's rights under the '555 patent against subsequent purchasers and users of the accused Marvell chipsets are exhausted.

113.    Norman IP is attempting to require Crestron to pay a second royalty for a license to use and sell products that Norman IP has already licensed under the Norman-RPX license agreement. Norman has received payment of royalties for those licensed rights from at least RPX, and the payment of additional royalties, and the demand for payment of additional royalties, for the right to use and sell the same products from Crestron constitutes patent misuse.

### Tenth Affirmative Defense – Breach of Duty to Disclose to IEEE

114.    Norman IP's First Amended Complaint in this litigation alleges that Crestron's sale of products in the United States that are equipped with 802.11 standard compliant wireless chipsets infringe the '555 patent.

115.    Norman IP's claims for infringement by such wireless chipsets are barred because AMD failed to disclose its ownership of the application for the '555 patent and the issued '555 patent while participating in the development of the 802.11 standard.

116.    The Institute of Electrical and Electronics Engineers ("IEEE") Standards Association developed the "802.11" standard for wireless local area networks ("WLANs") that

Norman has asserted infringes the '555 patent in this litigation.

117.     AMD was an IEEE member during the development of the 802.11 standard and participated in the Working Group's development of the standard.  AMD was intimately involved in the development of the IEEE 802.11 standard at least as early as 1994.

118.     Page 8 of the June 1997 issue of the "LAN Newsletter" published by Information Gatekeepers, Inc. includes a quote from Mr. Robert Krueger, vice president of AMD's I/O and network products division, that "AMD has been a major player in the creation and adoption of the 802.11 standard."

119.     By the time the 802.11 standard was first published in 1997, five different AMD employees were actively involved in the standard setting committee's development work including Mr. Bob O'Hara, the Chief Technical Editor of the 802.11 standard, and Mr. Dave Bagby, Chair of the IEEE MAC Group.

120.     The application for the '555 patent was filed on April 12, 1994 and was assigned to AMD.  That patent application was pending at the time AMD was an IEEE member and Mr. O'Hara, Mr. Bagby, and three other AMD employees were participating in 802.11 standard Working Group development activities.

121.     The '555 patent issued on January 7, 1997 to AMD as the assignee.  At the time the patent was granted, AMD was still an IEEE member and Mr. O'Hara, Mr. Bagby, and three other AMD employees continued to participate in the 802.11 standard Working Group development activities.

122.     During the time when AMD was an IEEE member and participating in the development of the 802.11 standard, IEEE policies and/or practices provided that Working Group members such as AMD that held rights to pending patent applications or patents relating

to a standard being developed were required to disclose those applications and patents to the IEEE, and a Working Group member's obligation to disclose its patents and pending patent applications relating to a standard being promulgated continued as long as the member participated in development of the standard.

123.     Participants in IEEE standard development working groups, including the 802.11 standard working group, understood the IEEE patent policy, as explained to them in working group meetings, to impose a duty to disclose known patents and patent applications relevant to the standard being developed so that the working group could evaluate whether it was justified to include the patented technology in the standard.

124.     During the 802.11 standard Working Group meetings that Mr. O'Hara, Mr. Bagby, and other AMD employees participated in, Working Group members were repeatedly reminded of the IEEE patent policy and of their obligation to identify any pending patent applications or patents that might relate to the draft 802.11 standard being promulgated by the Working Group.

125.     For example, at a July 1993 meeting of the 802.11 standard working group attended by Mr. Bagby, Mr. O'Hara, Mr. Dave Roberts, and Ms. Jeanine Valadez, all of whom were employed by AMD at that time, the Chairman, Mr. Hayes, read the IEEE patent policy stated in the 1993 Standards Operations Manual to the group members attending the meeting.  In response, a number of the group members attending the meeting acknowledged their intention to disclose relevant patents to the working group. Shortly after the meeting, several members formally disclosed relevant patents to Mr. Hayes and the working group.

126.     As further examples, at meetings of the 802.11 standard working group that took place in November of 1994, March of 1995, August of 1995, and November of 1995, all of

which were attended by AMD employees, Mr. Hayes each time reminded the working group members attending the meetings of their obligation to disclose patents and patent applications relevant to the 802.11 standard of which they were aware, and explicitly requested the members attending the meetings to disclose any such patents and patent applications.

127.    As still another example, in September of 1995, the IEEE Standards Board Patent Committee approved proposed text for IPR letters prepared by Mr. Hayes for the 802.11 standard working group, stating that "[p]art of the task of this committee is to disclose any patent issues that they are aware of" and requesting each group member to notify Mr. Hayes "of any known patents related to technology described in the draft standard" and to forward the letter "to the appropriate person in your organization who is responsible for intellectual property rights for their review and action."  In September of 1995, Mr. Hayes sent that letter to each member of the 802.11 working group, including AMD's employees participating in the standard development activities of the 802.11 standard working group.

128.    During a 802.11 standard Working Group meeting, held on January 8, 1996, everyone attending was asked if they were aware of any patents which the draft 802.11 standard might infringe.  At the same meeting, attendees were reminded that the IEEE's patent policy required patent holders to notify the Working Group if their employers held any pending patent applications or patents that related in any way to the draft standard.

129.    While the '555 patent was pending before the USPTO, Mr. Krueger, vice president of AMD's I/O and network products division, represented in a March 1, 1996 Letter of Assurance to Mr. Hayes, the Chairman of the IEEE's 802.11 standard Working Group, that AMD was unaware of any patents or pending patent applications held by AMD relating to the draft 802.11 standard.

130.    Upon information and belief, Mr. Krueger, acting on behalf of AMD, wrote this Letter of Assurance with the knowledge and the intent that it would be made available to and relied upon by the IEEE's 802.11 standard Working Group, members of the IEEE, and others who rely on 802.11 activities, including the public and relevant third-parties.

131.    During 802.11 standard Working Group meetings, held on March 11, 1996, July 8, 1996, November 11, 1996, and March 10, 1997, the Working Group members were again reminded that the IEEE patent policy required the disclosure of pending patent applications and patents relating to the draft 802.11 standard.

132.    During a 802.11 standard Working Group meeting, held on July 7, 1997, the Working Group Chairman, Mr. Hayes, asked the Group's members to disclose any patent applications or patents they were aware of relating to the draft 802.11 standard and to submit the assurances required by the IEEE patent policy.  At least Mr. Bagby of AMD, among AMD's other employees participating in the Working Group's activities, attended this meeting and was aware of this request.

133.    During a 802.11 standard Working Group meeting, held on November 10, 1997, Mr. Hayes again asked the Group's members to disclose any pending patent applications and patents they were aware of relating to the draft 802.11 standard.

134.    The '555 patent issued on January 7, 1997 to AMD as its assignee.

135.    Upon information and belief, the '555 patent was never disclosed by AMD to the IEEE 802.11 standard Working Group.

136.    Assuming the truth of Plaintiff's allegations in its First Amended Complaint regarding the scope and subject matter of the '555 patent, it may be presumed that AMD intentionally and knowingly made material misrepresentations and/or omissions regarding the '555 patent to the 802.11 standard Working Group knowing and intending the same to be further

23

communicated to the IEEE, its members, and others who rely on 802.11 activities, including the public and relevant third-parties.

137.    Based on the foregoing, the misrepresentations and/or omissions were knowingly false and made in bad faith with the intent to deceive and to induce reliance.

138.    On information and belief, the IEEE, its members, their successors, and customers throughout the supply chain who rely on the 802.11 standard, including Crestron and its suppliers, reasonably and justifiably relied on AMD's misrepresentations and/or omissions, identified above, in adopting the 802.11 standard and by investing substantial resources designing, developing, and marketing products accused of alleged infringement in this action.

139.    Because AMD breached its duty to disclose the '555 patent to the IEEE 802.11 standard Working Group, the '555 patent is unenforceable under one or more equitable doctrines, such as fraud, unclean hands, estoppel, and/or waiver.

**Eleventh Affirmative Defense – Laches, Estoppel, Waiver, License, etc.**

140.    As discussed above, the '555 patent issued on January 7, 1997 to AMD as its assignee.  Upon information and belief, the IEEE 802.11 standard was approved on June 26, 1997.

141.    The '555 patent was assigned to AMD from its filing date of April 12, 1994 until it was assigned by AMD to Legerity, Inc. pursuant to an agreement executed on July 31, 2000 and recorded in the USPTO on April 23, 2001, after which the '555 patent remained assigned to Legerity until at least May 16, 2007.

142.    Throughout the respective periods during which AMD and Legerity owned the '555 patent, each company engaged in conduct indicating that it did not intend to enforce the '555 patent against products compliant with the IEEE 802.11 standard, such conduct indicating that it did not believe that the '555 patent covered products compliant with the IEEE 802.11

24

standard.

143.    Throughout the respective periods during which AMD and Legerity owned the

'555 patent, each company used language and/or exhibited conduct from which users of the

IEEE 802.11 standard, including Crestron and/or its suppliers, may properly infer that AMD

and/or Legerity consented and/or acquiesced to use of the '555 patent in connection with

products compliant with the IEEE 802.11 standard.

144.    While the '555 patent was pending before the USPTO, Mr. Krueger, vice

president of AMD's I/O and network products division, stated in a March 1, 1996 Letter of

Assurance addressed to Mr. Hayes, the Chairman of the IEEE's 802.11 standard Working Group,

that AMD was unaware of any patents or pending patent applications held by AMD relating to

the draft 802.11 standard.

145.    Upon information and belief, Mr. Krueger, acting on behalf of AMD, wrote this

Letter of Assurance with the knowledge and the intent that it would be made available to and

relied upon by the IEEE's 802.11 standard Working Group, members of the IEEE, and others who

rely on 802.11 activities, including the public and relevant third-parties.

146.    Page 8 of the June 1997 issue of the "LAN Newsletter" published by Information

Gatekeepers, Inc. quotes Mr. Krueger, vice president of AMD's I/O and network products

division, as stating that "AMD has been a major player in the creation and adoption of the 802.11

standard.  Our full commitment to 802.11 . . . ensure[s] WLAN vendors a virtually no-risk

opportunity to take place in this growing market."

147.    Upon information and belief, data sheets published by AMD which describe other

AMD products are marked with the patent numbers of the patents which cover those products

See, e.g., Exhibit 4 of the Complaint filed on November 29, 2010 in *Kilts Resources, LLC v.*

*Advanced Micro Devices, Inc.*, Case No. 2:10-cv-00512 (E.D. Tex.)

148.     A data sheet for the "Am79C930 PCnet™-Mobile Single-Chip Wireless LAN Media Access Controller" was issued by AMD in April 1997 as Publication No. 20183 Revision B, and is still available on AMD's website, http://support.amd.com/TechDocs/20183.pdf, as of the filing of the present Answer.

149.     Page 1 of this data sheet states that "[t]he Am79C930 device is the first single-chip wireless LAN media access controller (MAC) supporting the IEEE 802.11 (draft) standard," however the data sheet (which is 161 pages long) never indicates that this device is covered '555 patent, even though the '555 patent had already issued when this data sheet was published.

150.     Legerity issued a press release dated September 20, 2005, which was published at, and is still available as of the filing of the present Answer, on the BusinessWire website, http://www.businesswire.com/news/home/20050920005138/en/Legerity-Unveils-Industrys-Integrated-VoWiFi-Handset-Chip, entitled "Legerity Unveils Industry's Most Integrated VoWiFi Handset Chip and Software."  This press release describes Legerity's "introduction of its Le8100 Handset System-on-Chip (SoC) and WiFi Software Package as part of its Le8100 Voice-over-WiFi (VoWiFi) Reference Design" and indicates that "Legerity is sampling the Le8100 to select alpha customers."

151.     Legerity published additional information about the Le8100 on its website.  For example, upon information and belief, a web page publicly available on Legerity's website on November 4, 2006, http://web.archive.org/web/20061104193652/http://www.legerity.com/ indicated that the Le8100 supported "802.11 a, b, g, e, i".

152.     Even though this web page expressly mentions that Legerity owns "[o]ver 600 industry-first patents," neither this web page, the data sheet published by Legerity as Document No. 081372 and linked to by this web page, nor the aforementioned press release indicates that

the Le8100 is covered by the '555 patent.

153.    Legerity's corporate successor, Zarlink Semiconductor, asserted that "[n]o products were manufactured by, or for, Legerity, Inc, or sold directly or indirectly by Legerity, Inc., practising any of the claimed inventions in the" '555 patent in a letter dated September 9, 2008 and filed on December 30, 2008 as Document 212-4 in *Norman IP Holdings, LLC v. Lexmark Int'l, Inc.*, No. 6:11-cv-00495 (E.D.Tex.).

154.    Upon information and belief, during the respective periods for which AMD and Legerity owned the '555 patent, AMD and Legerity each made and/or offered for sale respective products compliant with the IEEE 802.11 standard, yet neither company marked these products with the '555 patent or otherwise indicated that the '555 patent covered these products.

155.    Upon information and belief, AMD and Legerity both knew that their competitors also made, used, and/or offered for sale products compliant with the IEEE 802.11 standard. Upon information and belief, neither AMD nor Legerity asserted the '555 patent against any competing products.

156.    Upon information and belief, the '555 patent was not asserted against any products supporting the IEEE 802.11 standard until after it was assigned to Norman IP's predecessor, Saxon Innovations, LLC in October 2007, which was more than a decade after both issue of the '555 patent and approval of the IEEE 802.11 standard.

157.    For over a decade after the issue of the '555 patent, AMD and Legerity engaged in conduct which was so inconsistent with an intent to enforce their rights under the '555 patent as to induce a reasonable belief that such rights had been relinquished.

158.    For over a decade after the issue of the '555 patent and the IEEE 802.11 standard, AMD and Legerity engaged in conduct which was so inconsistent with an intent to enforce their

rights under the '555 patent against products which support the IEEE 802.11 standard as to induce a reasonable belief that such rights had been relinquished.

159.    On information and belief, manufacturers and customers throughout the supply chain who rely on the 802.11 standard, including Crestron and its suppliers, were reasonably and justifiably induced by the conduct of AMD and Legerity to believe that AMD and Legerity had relinquished their rights, and accordingly invested substantial resources designing, developing, and marketing products accused of alleged infringement in this action.

160.    Norman IP and its predecessors have delayed bringing this litigation to the detriment of Crestron and without justification.  The '555 patent issued on January 7, 1997 and recently expired on April 12, 2014.  Upon information and belief, Norman IP and its predecessors knew or should have known that Crestron manufactured, used, and sold products which support the 802.11 standard several years before the filing of this lawsuit.  There is no reasonable justification for Norman's and/or its predecessor's delay in bringing its claims.

161.    On information and belief, manufacturers and customers throughout the supply chain who rely on the 802.11 standard, including Crestron and its suppliers, reasonably and justifiably relied on the conduct of Norman IP and its predecessors by investing substantial resources designing, developing, and marketing products accused of alleged infringement in this action.

162.    In view of the above, Norman's enforcement of the '555 patent is barred by one or more equitable doctrines, including laches, estoppel, license, and/or waiver.

### Twelfth Affirmative Defense – Contractor Immunity Under 28 U.S.C. § 1498

163.    Crestron makes significant sales to the federal government of the accused products and claims against Crestron relating to such sales are barred by 28 U.S.C. § 1498.

## COUNTERCLAIMS

Crestron, by its attorneys, asserts the following counterclaims against Norman and alleges as follows:

### The Parties

164.    Crestron is a corporation organized under the laws of New Jersey with its principal place of business located at 15 Volvo Drive, Rockleigh, New Jersey 07647.

165.    Norman is a limited liability company organized and existing under the laws of the State of Texas, with its principal place of business located in the State of New York.

### Jurisdiction and Venue

166.    There is an actual controversy between Crestron and Norman IP in that Norman IP has asserted in this litigation that Crestron infringes U.S. Patent No. 5,592,555 ("the '555 patent").

167.    The Court has personal jurisdiction over Norman IP because it has purposefully availed itself of the benefits and laws of this jurisdiction, including by filing the instant action.

### Counterclaim Count I – Non-Infringement of U.S. Patent No. 5,592,555

168.    Crestron has not and does not now directly infringe the '555 patent.

169.    Crestron has not and does not now jointly infringe the '555 patent.

170.    Crestron is entitled to a declaratory judgment from this Court under 28 U.S.C. §§ 2201 and 2202 that the '555 patent is not infringed by Crestron's actions.

### Counterclaim Count II – Invalidity of U.S. Patent No. 5,592,555

171.    Claim 51 of the '555 patent is invalid at least for the reasons identified by the U.S. Patent and Trademark Office ("USPTO") in the final Office Action issued on January 23, 2014

in *Ex Parte* Reexamination No. 90/012,783 and further discussed in the Request for *Ex Parte* Reexamination Application No. 90/012,783 filed with the USPTO on February 5, 2013.

172.    Claims 10 and 12 of the '555 patent are invalid at least for the reasons discussed in Request for *Ex Parte* Reexamination, Application No. 90/013,183 filed with the USPTO on March 21, 2014.

173.    Claims 10, 12 and 51 of the '555 patent are also invalid at least for the reasons discussed in Petition for *Inter Partes* Review No. IPR2014-00560 filed with the USPTO on April 1, 2014.

174.    Crestron is entitled to a declaratory judgment from this Court under 28 U.S.C. §§ 2201 and 2202 that the '555 patent is invalid.

### Counterclaim Count III – Unenforceability Due to Inequitable Conduct

175.    For at least the reasons identified above with regard to the Seventh Affirmative Defense, Crestron is entitled to a declaratory judgment from this Court under 28 U.S.C. §§ 2201 and 2202 that the '555 patent is unenforceable due to inequitable conduct during its initial prosecution.

176.    For at least the reasons identified above with regard to the Eighth Affirmative Defense, Crestron is entitled to a declaratory judgment from this Court under 28 U.S.C. §§ 2201 and 2202 that the '555 patent is unenforceable due to inequitable conduct during its initial prosecution.

### Counterclaim Count IV – Unenforceability under Equitable Doctrines

177.    For at least the reasons identified above with regard to one or more of the Ninth, Tenth, and Eleventh Affirmative Defenses, Crestron is entitled to a declaratory judgment from this Court under 28 U.S.C. §§ 2201 and 2202 that the '555 patent is unenforceable under one or more equitable doctrines.

## Counterclaim Count V – Breach of Contract

178.    In a March 1, 1996 Letter of Assurance addressed to Mr. Hayes, the Chairman of

the IEEE's 802.11 standard Working Group, Mr. Krueger, vice president of AMD's I/O and

network products division, represented that if "the standard adopted by the IEEE 802.11

Working Group is covered by one or more of the claims of any AMD patents or of any patents

maturing from pending or future applications, AMD agrees, upon written request, to negotiate a

non-exclusive license under such patents or such patents maturing from such applications on a

nondiscriminatory basis and on terms and conditions which AMD deems reasonable."

179.    Upon information and belief, Mr. Krueger, acting on behalf of AMD, wrote this

Letter of Assurance with the knowledge and the intent that it would be made available to and

relied upon by the IEEE's 802.11 standard Working Group, members of the IEEE, and others who

rely on 802.11 activities, including the public and relevant third-parties.

180.    This Letter of Assurance created a contractual obligation which binds the owner of

any patent subject to the contractual obligation created by this Letter of Assurance.

181.    As a user of the 802.11 standard, Crestron is a third-party beneficiary of, and thus has

the power to enforce, the binding contractual obligation created by the Letter of Assurance.

182.    Norman IP alleges in paragraphs 13 and 14 of the Amended Complaint that "with

knowledge of the '555 Patent, Crestron has intended infringing acts in accordance with the"

IEEE 802.11 standard, and more particularly that "Crestron intentionally implements relevant

provisions of the IEEE 802.11 specification relating to wireless security. Crestron specifies wireless

controllers that are compliant with these aspects of IEEE 802.11. The subject controllers are designed

and manufactured to operate in a manner which infringes the '555 Patent during normal operation."

183.    Norman IP further alleges in paragraph 12 of the Amended Complaint that "IEEE

802.11 provides, *inter alia*, for the programmatic selection from among a plurality of wireless

31

security algorithms, including for example WPA1, WPA2, TKIP, EAP and/or LEAP, in accordance with the asserted claims of the '555 Patent."

184.    Thus, the Amended Complaint at paragraphs 12-14 suggests that the IEEE 802.11 standard "is covered by one or more claims of" the '555 patent.

185.    However, if the IEEE 802.11 standard "is covered by one or more claims of" the '555 patent, then Norman IP is contractually required by AMD's Letter of Assurance to offer Crestron a reasonable and non-discriminatory license to the '555 patent.

186.    Norman IP has failed to offer Crestron a reasonable and non-discriminatory license to the '555 patent as required by AMD's Letter of Assurance.

187.    Norman IP has engaged in conduct inconsistent with Norman IP's contractual obligation under AMD's Letter of Assurance to offer Crestron a reasonable and non-discriminatory license to the '555 patent, such as requesting injunctive relief with respect to the '555 patent in the First Amended Complaint.

188.    Norman IP has breached its contractual obligation under AMD's Letter of Assurance.

189.    Crestron has incurred substantial damages from Norman IP's breach of its contractual obligation under AMD's Letter of Assurance.

190.    Crestron will continue to incur substantial damages unless Norman IP is enjoined from continuing to breach its contractual obligation under AMD's Letter of Assurance.

### Counterclaim Count VI – Exceptional Case

191.    Crestron seeks a declaration that this case is exceptional, and, to the extent needed, asserts a counterclaim for this declaration.  During the present litigation, Norman IP has sought relief to which it is not entitled by asserting arguments which lack a legal and/or factual basis.

192.     In the Original Complaint filed in the present lawsuit on May 13, 2013, Norman IP sought injunctive relief and monetary damages based on Crestron's alleged infringement of U.S. Patent No. 5,502,689 ("the '689 patent").

193.     The '689 patent expired on March 26, 2013.

194.     Norman IP filed the Original Complaint after the '689 patent had already expired.

195.     Binding legal precedent clearly establishes that there is no right to injunctive relief for an expired patent, and Norman IP has not presented any argument for changing the law.

196.     Norman IP's request for injunctive relief based on Crestron's alleged infringement of the expired '689 patent lacked any legal or factual basis, and thus was frivolous.

197.     35 U.S.C. § 287 provides that, where products practicing a patent have not been marked, "no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice."

198.     Norman IP has not alleged that products practicing the '689 patent have been marked in compliance with 35 U.S.C. § 287.

199.     Upon information and belief, Norman IP, its predecessors-in-title, and/or their licensees have failed to mark products which practice the '689 patent, such as the products discussed by Legerity's corporate successor, Zarlink Semiconductor, in a letter dated September 9, 2008 and filed on December 30, 2008 as Document 212-4 in *Norman IP Holdings, LLC v. Lexmark Int'l, Inc.*, No. 6:11-cv-00495 (E.D.Tex.).

200.     Because products practicing the '689 patent have not been marked, Norman IP can only recover damages for infringement of the '689 patent occurring after Crestron was notified of the alleged infringement.  Therefore, if Crestron was not notified of its alleged

infringement until after the expiration of the '689 patent, Norman IP cannot recover any damages for infringement of the '689 patent from Crestron.

201.    The Original Complaint at paragraph 15 asserts that "Crestron has had knowledge of the Patents at least since its having been served written notice on March 25, 2013."  The Amended Complaint at paragraph 15 similarly asserts that "Crestron has had knowledge of the [] Patent at least since its having been served written notice on March 25, 2013."

202.    Crestron was not served written notice on March 25, 2013, or at any other time prior to the expiration of the '689 patent on March 26, 2013.

203.    Although the alleged written notice (subsequently submitted as Exhibit 2 of the Amended Complaint) was mailed by Norman IP on March 25, 2013, it was not delivered to Crestron until April 1, 2013, as evidenced by Exhibit 3 of the Amended Complaint, which paragraph 15 of the Amended Complaint describes as a "true and correct copy of the return receipt of the written notice."

204.    At the time that Norman IP filed the original Complaint, Norman IP knew that Crestron had not been served written notice on March 25, 2013, or at any other time prior to the expiration of the '689 patent on March 26, 2013, at least by virtue of Norman IP having received "the return receipt of the written notice" which Norman IP subsequently submitted as Exhibit 3 of the Amended Complaint.

205.    Norman IP's false assertion in the Original Complaint that Crestron was "served written notice on March 25, 2013," was made with knowledge of its falsity and with the intent to deceive the Court.  Norman IP attempted to deceive the Court by falsely asserting that Crestron had been notified of its alleged infringement prior to the expiration of the '689 patent and hence

34

35 U.S.C. § 287 did not prevent Norman IP from recovering any damages from Crestron for infringement of the '689 patent.

206.    Crestron did not receive notice of, and hence was not notified of, its alleged infringement of the '689 patent until Norman IP's written notice was delivered on April 1, 2013, which was after the '689 patent expired on March 26, 2013.

207.    Because Crestron did not receive notice of, and hence was not notified of, its alleged infringement of the '689 patent until after the expiration of the '689 patent; 35 U.S.C. § 287 prevents Norman IP from recovering any damages from Crestron for infringement of the '689 patent.

208.    Norman IP's request for monetary damages based on Crestron's alleged infringement of the expired '689 patent lacked any legal or factual basis, and thus was frivolous.

209.    Norman IP's frivolous requests for injunctive relief and monetary damages based on Crestron's alleged infringement of the expired '689 patent required Crestron and its counsel to expend significant time and money in connection with a Motion to Dismiss filed on July 29, 2013 as Document 54 in the present litigation.

210.    A Response to this Motion filed by Norman IP on August 22, 2013 as Document 77 states on page 2 that "Norman has decided to withdraw its allegations of infringement of the '689 Patent.  Crestron's arguments that the '689 Patent infringement allegations should be dismissed are now moot."

211.    Norman IP has engaged in further litigation misconduct including repeatedly making false statements to the Court with knowledge of their falsity.

212.    Both the Original Complaint at paragraph 6 and the Amended Complaint at paragraph 5 assert that "Plaintiff Norman is a corporation organized and existing under the laws of the State of Texas".

213.    Norman IP is organized and exists under the laws of the State of Texas as a limited liability company, rather than a corporation.

214.    Article I of Norman IP's Certificate of Formation (submitted as Document 132-9 in *Norman IP Holdings, LLC v. Casio Computer Co., Ltd.*, No. 6:09-cv-00270 (E.D. Tex.) on May 18, 2010) expressly states that Norman IP is a limited liability company.

215.    State of Texas Secretary of State Form 205 (entitled "Certificate of Formation—Limited Liability Company") states at page 1, paragraph 1, that "[t]he limited liability company (hereinafter LLC) is neither a corporation nor a partnership; rather, it is a distinct type of entity".

216.    The Texas Business Organizations Code, including §§ 1.002 and 1.008 thereof, clearly distinguishes between limited liability companies (which are governed by the Texas Limited Liability Company Law) and corporations (which are governed by the Texas Corporation Law).

217.    The representations by Norman IP to the Court in the Original Complaint and the Amended Complaint that it "is a corporation organized and existing under the laws of the State of Texas" are false.

218.    A Declaration was executed by Mark Mancinelli on May 7, 2012 and filed on May 8, 2012 as Document 167-1 in *Norman IP Holdings, LLC v. Lexmark Int'l, Inc.*, No. 6:11-cv-00495 (E.D.Tex.) (hereinafter "Mancinelli Declaration").

219.     Paragraph 2 of the Mancinelli Declaration states that Mancinelli has served as Norman IP's managing director since Norman IP was founded and that, through his role in this position, he has personal knowledge of Norman's legal affairs and general business activities.

220.     Paragraph 3 of the Mancinelli Declaration states that "Norman is a limited liability company organized under the laws of the State of Texas."

221.     Norman IP had actual knowledge that its representations to the Court in the Original Complaint and the Amended Complaint that it "is a corporation organized and existing under the laws of the State of Texas" were false.

222.     Both the Original Complaint at paragraph 6 and the Amended Complaint at paragraph 5 further assert that Norman IP has "its principal place of business located at 100 E. Ferguson, Suite 900, Tyler, Texas 75702".

223.     In *Hertz Corp. v. Friend*, 130 S.Ct. 1181, 1186 (U.S. 2010), the U.S. Supreme Court unanimously ruled "that the phrase 'principal place of business' refers to the place where the corporation's high level officers direct, control, and coordinate the corporation's activities."

224.     In Paragraph 2 of the Mancinelli Declaration, Mancinelli states that he has served as Norman IP's managing director since Norman IP was founded.  In Paragraph 1 of the Mancinelli Declaration, Mancinelli states that he lives in New York, New York.

225.     According to Paragraph 3 of the Mancinelli Declaration, "Attachment A is a true, correct and complete copy of a recent invoice of Norman's lease indicating the address of our corporate office in Tyler, Texas."

226.     Attachment A of the Mancinelli Declaration shows that the invoice for Norman IP's lease of its purported principal place of business in Tyler, Texas was billed to "Norman IP Holdings & Saxon Innovations" at an address in New York, New York.

37

227. The Certificate of Formation for Norman IP Holdings II, LLC was submitted as Document 146-8 in *Norman IP Holdings, LLC v. Lexmark Int'l, Inc.*, No. 6:11-cv-00495 (E.D.Tex.) and includes a letter signed by Mancinelli on behalf of Norman IP, in which Mancinelli stated that he is the holder of the majority of the membership interests in Norman IP and is empowered to make all decisions involving the interests of Norman IP.  The letter indicates an address for Norman IP Holdings, LLC in Garrison, New York.

228. Upon information and belief, Mancinelli directs, controls, and coordinates Norman IP's activities.

229. Upon information and belief, the place where Mancinelli directs, controls, and coordinates Norman IP's activities is New York rather than Texas.

230. Upon information and belief, New York, rather than Texas, is Norman IP's principal place of business.

231. *Hertz v. Friend*, 130 S.Ct. at 1195, states that "if the record reveals attempts at manipulation—for example, that the alleged 'nerve center' is nothing more than a mail drop box, a bare office with a computer, or the location of an annual executive retreat—the courts should instead take as the 'nerve center' the place of actual direction, control, and coordination, in the absence of such manipulation."

232. According to a Declaration executed by Michael Collins on May 15, 2012 and filed on May 17, 2012 as in *Norman IP Holdings, LLC v. Lexmark Int'l, Inc.*, No. 6:11-cv-00495 (E.D.Tex.), Norman IP's purported principal place of business (100 E. Ferguson, Suite 900, Tyler, Texas 75702) is "a vacant office".

233. Upon information and belief, Norman IP does not have "its principal place of business located at 100 E. Ferguson, Suite 900, Tyler, Texas 75702".159.  Upon information and

38

belief, Norman IP's characterization of "a vacant office" as its principal place of business is an "attempt[] at manipulation" as described in *Hertz v. Friend*, 130 S.Ct. at 1195.

234.     Upon information and belief, Mancinelli is an attorney licensed to practice law in the State of New York.

235.     Upon information and belief, Mancinelli has been licensed to practice in law in the State of New York at least since February 5, 2009 when he was "reinstated as an attorney and counselor-at-law in the State of New York" pursuant to *Committee on Professional Standards v. Mancinelli*, 59 A.D.3d 780 (N.Y. App. Div. 2009).

236.     Upon information and belief, prior to the aforementioned reinstatement, Mancinelli had been suspended from the practice of law in the State of New York since June 7, 1999 pursuant to *In re Attorneys in Violation of Judiciary Law § 468-a*, 262 A.D.2d 702 (N.Y. App. Div. 1999), which found that Mancinelli's "continued failure to comply with" New York Judiciary Law § 468-a "constitutes conduct prejudicial to the administration of justice" and "professional misconduct warranting discipline".

237.     Upon information and belief, Mancinelli was in the State of New York when he consented to the filing of the Original Complaint and the Amended Complaint by Norman IP.

238.     Under 35 U.S.C. § 285, Fed. R. Civ. Proc. 11, N.Y. Jud. Law § 487 (as applicable), and/or the Court's inherent power to impose sanctions, Crestron is entitled to recover at least the costs it incurred because of Norman IP's bad faith conduct and frivolous claims, including its requests for injunctive relief and monetary damages based on the alleged infringement of the '689 patent.

**PRAYER FOR RELIEF**

WHEREFORE, Crestron requests a judgment:

A.      Declaring that Crestron does not infringe any claim of the '555 patent;

B.      Declaring that the claims of the '555 patent are invalid;

C.      Declaring that the claims of the '555 patent are unenforceable;

D.      Declaring that Crestron is not liable in any way for the relief sought in the First Amended Complaint, denying Norman all such relief, and dismissing the First Amended Complaint with prejudice;

E.      Permanently enjoining Norman and its agents and employees from continuing its unlawful actions set forth herein;

F.      Awarding damages and/or treble damages to Crestron in an amount to be determined at trial;

G.      Awarding pre-judgment and post-judgment interest at the highest rate allowed by law;

H.      Awarding costs to Crestron;

I.      Declaring this case exceptional and awarding attorneys' fees to Crestron; and

J.      Awarding such other and further relief as the court deems equitable and just.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Crestron hereby demands a trial by jury for all issues so triable raised by Norman IP's First Amended Complaint and/or Crestron's Answer and Counterclaims.

Dated:        April 21, 2014                    Respectfully submitted,


                                                /s/ William C. Bergmann
                                                WILLIAM C. BERGMANN
                                                Baker & Hostetler LLP
                                                Washington Square, Suite 1100
                                                1050 Connecticut Avenue, NW
                                                Washington, DC 20036-5304
                                                Telephone: (202) 861-1500
                                                Facsimile: (202) 861- 1783
                                                Email: wbergmann@bakerlaw.com

                                                HARRY GILLAM
                                                Gillam & Smith LLP
                                                303 S. Washington Ave.
                                                Marshall, TX 75670
                                                Telephone: (903) 934-8450
                                                Facsimile: (903) 934-9257
                                                Email: gil@gillamsmithlaw.com

                                                **ATTORNEYS FOR DEFENDANT
                                                CRESTRON ELECTRONICS, INC.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was filed electronically via the Court's CM/ECF system in compliance with Local Rule CV-5(a) and was served on all counsel who are deemed to have consented to electronic service per Local Rule CV-5(a)(3)(A).  Pursuant to Local Rule CV-5(d), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing via email, on April 21, 2014.

      /s/ William C. Bergmann<br>
WILLIAM C. BERGMANN